**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

JOSEPH PAUL GUARNERI,

                       Plaintiff,

        v.                                      No. 08-CV-792
                                                (TJM/DRH)

R.K. WOOD, Superintendent, Upstate Correctional
Facility; M. TIRONE, Deputy Superintendent,
Upstate Correctional Facility; L. PEARY, Sergeant
of Grievance Program; LESTER WRIGHT, Chief
Medical Officer and Associate Commissioner;
BRIAN FISCHER, Commissioner; LUCIAN
LECLAIRE, Deputy Commissioner; M. TRAVERS,
Nurse; N.P. PARMER; CARR, Correctional Officer;
WARRINER, Correctional Officer; JOHN DOE,
Sergeant; JANE DOE, Nurse Administrator; JOHN
DOE, Medical Director; SOUCIA, Law Library
Officer; J. DEMARSE, Mental Health Counselor; R.
HALLARD, Counselor;  GEORGE B. ALEXANDER,
NYS Division of Parole; PETER SKINNER, Parole
Officer; B. ROBIN, Senior Parole Officer; MR.
LOWARY, Parole Area Supervisor; and LUSSEVE,
Parole Officer;

                                 Defendants.[1]

_____

**APPEARANCES:**                         **OF COUNSEL:**

JOSEPH PAUL GUARNERI
Plaintiff Pro Se
Schoharie County Correctional Facility
Post Office Box 689

_____

     [1] Defendant Sergeant John Doe, defendant nurse administrator Jane Doe, defendant medical director John Doe and defendants Soucia, Demarse, and Lusseve have neither appeared nor been served in this action.  Fed. R. Civ. P. 4(m) requires that a complaint be served upon a defendant within 120 days after the complaint is filed or the complaint may be dismissed as to any unserved defendant without prejudice.  See also N.D.N.Y.L.R. 4.1(b). The complaint here was filed on July 21, 2008.  Compl. (Dkt. No. 1). No summons were served upon these defendants.  More than 120 days have passed since the complaint was filed.  Accordingly, it is recommended that the complaint be dismissed as to these five defendants without prejudice pursuant to Rule 4(m) and Local Rule 4.1(b).

Schoharie, New York 12157[2]

HON. ERIC T. SCHNEIDERMAN                    DEAN J. HIGGINS, ESQ.
Attorney General for the                              Assistant Attorney General
    State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[3]

Plaintiff pro se Joseph Paul Guarneri ("Guarneri"), formerly an inmate in the custody of

the New York State Department of Correctional and Community Services ("DOCCS"),

brings this action pursuant to 42 U.S.C. §§ 1983 and 1985 alleging that defendants, a

DOCS Commissioner, fifteen DOCS employees, and five employees of the New York State

Division of Parole, violated his constitutional rights under the First, Fifth, Eighth and

Fourteenth Amendments.  Compl. (Dkt. No. 1).  Presently pending is defendants' motion for

summary judgment.  Dkt. No. 91.  Guarneri opposes the motion.  Dkt. No. 93.  For the

reasons which follow, it is recommended that defendants' motion be granted.

_____

[2]In the last document filed by Guarneri in this case, he listed a return address of
1597 Canady Hill road, Middleburgh, New York 12122.  See dkt. No. 93 at 11.  Guarneri
has taken no action to change the address for him listed in the docket of this case to the
Middleburgh address.  However, the Clerk is directed to send a copy of this report-
recommendation to Guarneri at both the address listed in the docket and to the
Middleburgh address listed in this footnote.

[3]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

**I. Background**

The facts are related herein in the light most favorable to Guarneri as the non-moving party.  See subsection II(A) infra.

**A. Medical Care**

Guarneri's medical complaints occurred while he was confined in Upstate Correctional Facility ("Upstate") from April 15 until August 15, 2008.  Compl. ¶ 2.

As background to those complaints, in July 2006, Guarneri complained of "give away" episodes in his right knee.  Dkt. No. 91-11 at 148; 93-1 at 46.  Guarneri was diagnosed with a chronic ACL tear, with some arthritic changes, to the knee, but it was observed that Guarneri ambulated with a normal gait and had no swelling or signs of severe arthritic changes.  Dkt. No. 91-11 at 148; 93-1 at 46.  When surgery was discussed with Guarneri he stated that he "had an option of doing [surgery] through medical providers who cover the prison . . . , but has decided not to," expressing his preference to undergo surgery by his personal physician when he was no longer incarcerated.  Dkt. No. 91-11 at 148; 93-1 at 46. On August 8, 2007, an MRI report of Guarneri's knee and shoulder showed a chronic tear of the ACL with ganglion cysts on the back of his knee joint and a nearly full-thickness tear of the rotator cuff.  Dkt. No. 91-11 at 145; Dkt. No. 93-1 at 48.  During Guarneri's follow-up appointment at the Bassett Hospital, the provider shared the MRI results with Guarneri and noted that he still appeared to be in no acute distress, retained good strength and mobility, and "ha[d] at least a partial rotator cuff tear [and] . . . an old ACL tear and some degenerative change" which can continued to be treated conservatively with a knee brace, therapy, and steroid injections.  Dkt. No. 91-11 at 143-44; Dkt. No. 93-1 at 44-45.

3

Prior to the winter of 2007, Guarneri was reincarcerated.  His medical records from the correctional facility prior to his time at Upstate indicated his history of an ACL tear and use of a knee brace.  Dkt. No. 91-11 at 37; Dkt. No. 93-1 at 21.  Guarneri told medical staff at the facility that he could not climb stairs or walk more than thirty feet without the brace.  Dkt. No. 91-11 at 37; Dkt. No. 93-1 at 21.  However, the medical staff noted that Guarneri's knee was neither tender nor swollen, he retained good range of motion in the joint, and he ambulated around his bed without the brace.  Dkt. No. 91-11 at 37; Dkt. No. 93-1 at 21.  In January and February, 2008, Guarneri was seen by medical staff on at least three occasions ambulating around the correctional facility without difficulty without his knee brace.  Dkt. No. 91-11 at 36-37; Dkt. No. 93-1 at 21.  In February 2008 Guarneri also began refusing Tylenol and Ibuprofen and requesting prescription pain medication for the pain associated with his knee and shoulder.  Dkt. No. 91-11 at 35-36.  Medical staff denied him the prescription medication, but continued to offer him the over-the-counter pain medication, which Guarneri claimed he could not take because of ulcers.  Id.  The medical records make no mention of an ulcer condition.

At the end of February 2008, Guarneri was given a prescription for physical therapy twice a week, for four weeks, to assist with his joint pain and ambulatory difficulties.  Dkt. No. 91-11 at 49.  Guarneri attended the first therapy session, but he refused therapy on March 10, 12, 17, and 19, and, due to non-compliance, was discharged from therapy.  Dkt. No. 91-11 at 49-62.  Guarneri was then transferred to Upstate.  Dkt. No. 91-11 at 13-14; Dkt. No. 93-1 at 24-25.

Upon entry to Upstate, Guarneri advised prison officials of his various medical problems

and that he possessed a knee brace.[4]   However, the intake screening indicated that

Guarneri did not need special accommodations as he continually refused to participate in

physical therapy for his knee, appear to be acutely ill, or appear to have any other

contraindications for placement in a double cell or bunk bed.  Dkt. No. 91-11 at 79-80;

Travers Decl. (Dkt. No. 91-8) ¶ 7.  On April 17, 2008, defendant Parmer conducted a chart

review and confirmed that there was no evidence for continued use of Guarneri's knee

brace, as Guarneri's medical record indicated that he could ambulate without difficulty.  Dkt.

No. 91-11 at 26; Travers Decl.  ¶¶ 8, 10.  As there were no radiology results in Guarneri's

chart, however, Parmer ordered x-rays to be obtained and also prescribed the brace when

traveling distances over fifty feet.  Dkt. No. 91-11 at 26; Travers Decl.  ¶¶ 9-10.  Despite the

in-take form, it appears Guarneri was also prescribed a permit limiting him to a lower bunk.

Dkt. No. 91-11 at 11.

On April 22, 2008, an EKG was requested for Guarneri to test for hypertension.  Dkt. No.

91-11 at 31.  On April 22, Guarneri refused his morning medication, claiming it upset his

stomach.  Dkt. No. 91-11 at 26.  From April 25 through 28, Guarneri refused to take his

mental health medication.  Travers Decl. ¶ 18.  Medical staff discussed the risks of his

refusals with Guarneri and presented him with forms to sign.  Dkt. No. 91-11 at 24-25, 72-

78; Dkt. No. 93-1 at 36.  On May 2, 2008, after speaking with a psychiatrist, Guarneri's

---

[4] Those problems included mental health issues.  "Mental Health services at
Upstate are provided by employees of the New York State Office of Mental Health which
has personnel working at Upstate."  Travers Decl. (Dkt. No. 91-8) ¶ 6;
see also Holanchock Decl. (Dkt. No. 91-9) ¶¶ 4-5 (explaining that law dictates that mental
health care at correctional facilities by provided by the Office of mental Health and, as
such, the office has its own employees prescribing medication and providing such care
within the correctional institutions).  "In the Guarneri case, the mental health care about
which [he] complains was not undertaken by or was the responsibility of the DOCS'
defendants in the case."  Holanchock Decl. ¶ 6.

mental health medication was discontinued.  Travers Decl. ¶ 19.

On May 1, 2008, Guarneri was seen by Parmer, requesting an increase in pain medication for his knee and shoulder.  Dkt. No. 91-11 at 24; Dkt No. 93-1 at 35; Travers Decl. ¶¶ 13-14.  Guarneri informed medical staff that he would have his knee and shoulder "fixed" when he got out of prison and medical staff responded by prescribing him a pain medication and his knee brace for distances of fifty feet or more.  Dkt. No. 91-11 at 24; Dkt No. 93-1 at 35; Travers Decl. ¶¶ 15-16, 20.  On May 6, 2008, the radiology report for Guarneri's right knee x-rays was received, showing early signs of degenerative joint disease.  Dkt. No. 91-11 at 46; Dkt. No. 93-1 at 40.  On or about May 10, 2008, Guarneri sought an increase in his prescription pain medication.  Dkt. No. 91-11 at 22; Dkt. No. 93-1 at 33; Travers Decl. ¶ 21.  The request was denied as Guaneri had not yet given the medication a fair amount of time to improve his pain and receive its full therapeutic effect.  Dkt. No. 91-11 at 22; Dkt. No. 93-1 at 33; Travers Decl. ¶ 21.

On May 19 and 21, Guarneri refused undergoing blood work and laboratory testing.  Dkt. No. 91-11 at 22, 70.  However, during that time period Guarneri did request and receive treatment for various skin problems, but during these appointments Guarneri was abrasive and argumentative.  Dkt. No. 91-11 at 21-22.  On May 22, 2008, Guarneri was advised by Parmer of the results of his x-rays that they revealed early degenerative joint disease attributable to normal wear and tear on his knee.  Travers Decl. ¶ 22.  On June 7, 2008, Guarneri again requested an increase in the doseage of his prescription pain medication.  Dkt. No. 91-11 at 20; Dkt. No. 93-1 at 31.  Medical staff saw Guarneri on June 20th, indicating there were no additional requests when his medication was dispensed.  Dkt. No. 91-11 at 20; Dkt. No. 93-1 at 31.  On June 28, 2008, Guarneri again requested an

6

increase in the dosage of his prescription medication and an examination to discuss this issue was scheduled for July 10, 2008.  Dkt. No. 91-11 at 19; Dkt. No. 93-1 at 30; Travers Decl. ¶ 23.

On July 10, 2008, Guarneri was seen at his medical examination by Parmer and did not exhibit any signs or symptoms of acute pain.  Dkt. No. 91-11 at 17; Dkt. No. 93-1 at 28; Travers Decl. ¶ 24.  Guarneri had refused therapy and surgical interventions while incarcerated, as well as over-the-counter pain medication.  Dkt. No. 91-11 at 17; Dkt. No. 93-1 at 28; Travers Decl. ¶ 24.  His request was denied, but his level of prescription pain medication was renewed.  Dkt. No. 91-11 at 17; Dkt. No. 93-1 at 28; Travers Decl. ¶ 25; see also Dkt. No. 91-11 at 67, 69 (prescription medication chart showing provision of Ultram for months of May and August).  No further medical treatment was rendered prior to Guarneri's release.  On August 5, 2008, upon release Guarneri was to receive prescription pain medication, and that on August 8, the provider ordered a thirty-day supply of said medication.  Dkt. No. 91-11 at 4; Dkt. No. 93-1 at 26.

Prior to February 2009, Guarneri was again incarcerated.  Guarneri continued to complain of pain, requested for medication, and displayed aggressive and threatening behavior towards medical staff.  Dkt. No. 91-11 at 123-24.  On February 27, 2009, Guarneri was ambulatory, there was no swelling in his knee, and the medical staff provided him with treatment including non-narcotic pain medication, to avoid the possibility of addiction, physical therapy, or an orthopaedic consultation.  Dkt. No. 91-11 at 118.  In March and April, 2009, Guarneri was provided with a knee brace and also participated in physical therapy.  Dkt. No. 91-11 at 117, 159, 138-41.

On June 11, 2009, Guarneri again insisted on pain medication for his knee, specifically

7

requesting the medication previously provided to him at Upstate, refusing all other medications offered to him, and becoming verbally abusive towards medical staff. Dkt. No. 91-11 at 109. Guarneri still ambulated without difficulty, walked up stairs, and dressed without difficulty. Dkt. No. 91-11 at 108. Medical staff from the facility also concluded that no acute or pharmacological intervention was indicated at that time. Id. In July 2009, Guarneri was "cheeking" his medication, refusing to take it, and attempting to flush the pills down the sink after the medical staff had left the cell area. Dkt. no. 91-11 at 106-107.

Prior to January 2010, Guarneri was released from prison. On January 5, 2010, Guarneri began treating with Dr. Belanger, complaining of knee and shoulder pain, claiming that his pain medication was not effective, and stating his intentions on returning to Bassett Hospital to receive surgery on his joints. Dkt. No. 93-1 at 9, 15. On February 3, 2010, Dr. Belanger reported that Guarneri was becoming aggressive with his staff and suggested that Guarneri find another physician to treat him, noting that "[i]n all honesty, [Guarneri] really needs to be in some for of structured living where medications are monitored." Dkt. No. 93-1 at 8, 12. Guarneri continued to complain of inadequate pain management and Dr. Belanger agreed to continue treating him so long as he never threatened himself or his staff. Id. On June 3, 2010, Guarneri returned for an increase in pain medication and had been taking twice as much medication as was prescribed for him. Dkt. No. 93-1 at 6, 10. Dr. Belanger expressed concern about increasing Guarneri's pain medication and instead suggested radiology exams and referral to a pain management clinic. Id. At the end of the month, Guarneri returned twice more for the same reason – that he had run out of pain medication before he could refill his prescriptions. Dkt. No. 93-1 at 13. Dr. Belanger noted that Guarneri's x-rays had remained unchanged and that he would be required to wait until

8

it was appropriate to refill his medication to receive any further medication.  Id.


## B. Parole

Guarneri was released on parole supervision on April 26, 2006.  Dkt. No. 91-13 at 142.

On June 5, 2006, Guarneri violated his parole, parole was revoked, and he was ordered

into custody for twelve months.  Id.  Guarneri was released back on parole supervision on

June 7, 2007, whereupon he was placed at the Parole Stabilization Program in Albany.  Id.

Guarneri was also issued special conditions of release, which prohibited contact with

various persons without prior permission of probation, including his mother and ex-wife.  Id.

at 70.  Guarneri was not allowed to return to his home because of a protective order his

mother had obtained against him.  Compl. ¶ 92; Guarneri Dep. at 91; see also  Dkt. No. 91-

13 at 21 (portion of pre-sentence report where mother states that Guarneri "is not welcome

in her home and . . . that she is fearful of her son and . . . is of the belief that there will be a

full restraining order in effect . . . .").

Guarneri was housed at the Parole Stabilization Program from June 7 through 27, 2006.

Dkt. No. 91-13 at 51-53.  During the three weeks, staff met with Guarneri and drug tested

him, staff had conference calls with Albany County Mental Health to assess Guarneri's

wellness, and Guarneri completed intake procedures at a drug and alcohol rehabilitation

program.  Id. at 52.  On the morning of June 27, Guarneri was disruptive and claimed that

he required psychiatric help and that he could not get an appointment with mental health.

Id.  Defendant Lowrey reviewed Guarneri's file and discovered that he was previously seen

by Schoharie County Mental Health, the agency was contacted, a request for an

appointment was made, and Schoharie staff indicated there would schedule the

appointment and subsequently notify Guarneri.  Id.  However, by that afternoon Guarneri's

problems adapting to the Parole Stabilization Program[5] came to a climax and he was

discharged from the program.  Id. at 51.

Upon release, Guarneri requested to be sent to his mother's home.  Dkt. No. 91-13 at

51.  Guarneri's mother agreed to allow him to stay with her despite the order of protection

and special conditions of release and it was made clear that if Guarneri because hostile or

threatening he would be immediately arrested.  Id.; Guarneri Dep. at 100-102.  While

residing with his mother, Guarneri was in constant contact with defendant Skinner,[6]

reporting that things were going well and that there were no issues with drugs, alcohol, or

police contact.  Id. at 48-51.  On July 25, 2007, Guarneri reported that his next appointment

with mental health providers would be August 9, 2007 and notes indicated that

transportation had been arranged for Guarneri.  Id. at 49.  On August 20, 2007, Guarneri

was served with a violation of parole report by Skinner for violative conduct which included

unauthorized contact with his ex-wife whom had an order of protection against Guarneri,

harassment and threatening his ex-wife, arrest, and failure to notify Skinner of his arrest.

Dkt. No. 91-13 at 139-41; see also Dkt. No. 91-13 at 155-57 (arrest report), Id. at 159-64

(affidavits).

On August 23, 2007, Guarneri attended a preliminary hearing for a parole violation.  Dkt.

No. 91-13 at 71-113, 137-38.  The hearing officer communicated, and Guarneri expressed

---

[5] Among the issues Guarneri expressed with the Parole Stabilization Program was
its inability to provide him with the necessary mental health care he required.  Guarneri
Dep. at 103, 107.

[6] Guarneri had repeated reports of transportation issues and was permitted to call
in to probation and to make special arrangements for reporting.  Dkt. No. 91-13 at 50.

understanding, of his rights at the hearing including the right to produce relevant documents

and witnesses, the right to cross-examine adverse witnesses, and the limited or qualified

right to an attorney if Guarneri had demonstrated a "outstanding need" for one.  Id. at 74.

The hearing officer questioned Guarneri and determined he was competent to proceed in

the hearing without the assistance of counsel.  Id. at 76-80.  Guarneri agreed with the

hearing officer's assessment.  Id. at 78.  Skinner proffered two different violations for

consideration by the hearing officer.  As to the first, Guarneri's alleged failure to immediately

communicate police conduct, the hearing officer declined to make a decision whether

probable cause supported the alleged parole violation.  Id. at 83-94, 151.  As to the second,

Guarneri's alleged contact with his ex-wife, the hearing officer found probable cause for the

violation.  Id. at 94, 151.

On September 26, 2007, the first of two final hearings was conducted with regard to

Guarneri's parole violation.  Dkt. No. 91-13 at 114-23.  Guarneri was represented by

counsel at the hearing.  Id. at 115.  The administrative law judge indicated that at the pre-

conference hearing, a plea could not be negotiated and a subsequent hearing would follow.

Id. at 116-17.  On November 28, 2007, the second final hearing was conducted.  Id. at 124-

36.  Guarneri was again represented by counsel.  Id. at 125.  During the hearing, the

administrative law judge recognized a negotiated plea between the parties, whereupon

Guarneri agreed to plea guilty to one of the parole violations and that the government would

dismiss all other pending charged violations.  Id. at 129, 134-35.  This would constitute

Guarneri's second violation of parole.  Id. at 129-30.[7]  Guarneri expressed understanding

---

[7] The first parole violation occurred on June 5, 2006, when Guarneri failed to
cooperate with medical treatment and was in possession of a knife.  Dkt. No. 91-13 at
142.

and assent to the terms of the plea.  Id. at 131, 133-34.  Additionally, the court recognized

that the habeas corpus action that Guarneri had filed, which dealt with the process afforded

to him during his preliminary hearing on August 23, was preserved and allowed to continue.

Id. at 131-32.

On January 21, 2008, Guarneri's habeas petition was denied, being classified as

"inappropriate . . . for a number of reasons [and] . . . rendered moot by the final

determination to revoke parole, which . . . was the petitioner's plea entered at the final

hearing."  Dkt. No. 91-13 at 68.  The habeas petition alleged the same violations in the

instant complaint that Guarneri's due process rights were violated by his inability to call

witnesses, the lack of Miranda Warnings, the absence of assigned counsel, and the

application of double jeopardy and collateral estoppel.  Id. at 65; see also Compl.  ¶¶ 97,

103-09.  The court discussed the merits of Guarneri's claims, which were rendered moot by

his guilty plea, explaining that his right to counsel was limited, double jeopardy was

inapplicable, and that Guarneri's assent to the conditions of parole indicated his

understanding of the revocation process if and when said conditions were violated.  Id. at

66-68.

### C. Grievances/Access to Court

Guarneri also contends that while at Upstate, his grievances were systematically denied

and that defendants failed to comply with their internal grievance procedures.  Compl. ¶¶

63-67.  Guarneri also alleges that defendants lost or destroyed his legal papers, denied him

provision of paper, required him to pay for his own photocopies, and failed to provide him

with adequate legal assistants in the library as those that were employed should have been

better trained in the law.  Id. ¶¶ 78-80, 87-88.  Guarneri alleges that this prejudiced his legal

actions.  Id. ¶ 82. Guarneri testified that his state actions were delayed, and some were

dismissed, but he was unable to provide any particular case names or numbers to

correspond with said dismissals.  Guarneri Dep. (Dkt. No. 91-12) at 85-87.


### D. Prior Lawsuits

Since 1999, Guarneri has filed at least fifteen civil actions in the Second Circuit, eight of

which have been filed in the Northern District of New York.  Dkt. No. 91-3.  In 2000, a

decision in the Southern District of New York concluded that Guarneri's § 1983 claim "ha[d]

failed to state a claim under federal law upon which relief can be granted against any of the

named d[e]f[endan]ts."  Guarneri v. Prison Health Servs., Inc. et. al., No. 99-CV-03211

(hereinafter Guarneri I) Dkt. No. 91-5 at 7, Entries 45, 47.  Guarneri was granted in forma

pauperis ("IFP") status in that case.  Id. at 2, Entry 1.

On  July 1, 2002, Guarneri's amended complaint in another 1983 action was dismissed

due to his failure to comply with a previous court order to further define and specify his

allegations.  Guarneri v. Sackit et. al., 02-CV-590 (LEK/RFT) (N.D.N.Y.) (hereinafter

Guarneri II) Dkt. No. 91-7 at 7, 10.  Guarneri sought reconsideration, the court vacated

dismissal, and Guarneri was granted leave to file a second amended complaint.  Id. at 3,

Entry 12 and 10-13.  Guarneri failed to file another amended complaint and the case was

dismissed.  Id. at 3, Entries 16-17.  In that case, Guarneri was granted IFP status.  Id. at 2,

Entry 3.

On January 21, 2005, Guarneri's § 1983 complaint against seven Schoharie County

employees was dismissed pursuant to Rule 41(b) of the Federal Rules of Civil Procedure

for a failure to prosecute and to comply with court orders.  Guarneri v. Meyers et al., No. 01-CV-1567 (GLS/DRH) (N.D.N.Y.) (hereinafter Guarneri III), Dkt. No. 91-6 at 9.  Guarneri failed to provide the court with his current address, precluding the litigation from advancing. Id. at 9-10.  Thus, the amended complaint was dismissed.  In that case, Guarneri was granted IFP status.  Id. at 2, Entry 5.

## II.  Discussion

Guarneri contends that his First Amendment rights were infringed upon as defendants (1) lost and or destroyed his legal papers (Compl. ¶ 78, 88), (2) denied him paper (Compl. ¶ 79), (3) charged him for photocopying relevant material (Compl. ¶ 87), and (4) failed to provide him with competent legal assistants at the law library (Compl. ¶¶ 78, 88).  Guarneri claims that his Eighth Amendment rights have been violated by defendants' (1) failure to treat his mental and physical health issues (Compl. ¶¶ 28-32, 36, 38, 42-43, 46-49, 53-58, 60), (2) policy to not provide inmates with treatment unless that inmate will be incarcerated up Upstate for at least a year (Compl. ¶ 33), (3) failure to preserve the confidentiality of his medical records (Compl. ¶ 61), (4) failure to provide him with all involved party names through FOIL requests (Compl. ¶¶ 41, 59) and (4) failure to provide him with continued care upon his release from prison (Compl. ¶ 51).  Guarneri claims that his Fourteenth Amendment rights were violated because (1) his grievances were systematically denied (Compl. ¶¶ 63, 67) and (2) defendants failed to comply with the grievance procedures (Compl. ¶ 65).  Guarneri also alleges Fourteenth Amendment violations in conjunction with his parole hearings, including being denied certain rights at his preliminary hearing.  Compl. ¶¶ 96-109.  Lastly, Guarneri contends that defendants conspired against him to obstruct

justice in the grievance program.  Compl. ¶¶ 71, 73.

Defendants first contend that Guarneri's IFP status should be revoked as he has received "three strikes" based upon his previous filings and dismissals.  As such, Guarneri's case should be dismissed unless and until he pays the appropriate filing fees.  Even if the merits of the case are considered, defendants seek dismissal based upon their contentions that (1) Guarneri's constitutional claims are meritless, (2) he fails to state a claim with regards to the grievance procedure, and (3) his claims regarding his parole are barred by the Rooker-Feldman doctrine.


### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could

15

find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

## B. 28 U.S.C. § 1915(g)[8]

Defendants seek dismissal of the complaint under 28 U.S.C. § 1915(g), which bars prisoners from proceeding IFP after three or more previous claims have been dismissed as frivolous, malicious, or for failing to state a claim.  See 28 U.S.C. § 1915(g) (2006).[9] Frivolous claims "lack[] an arguable basis either in law or in fact."  Tafari v. Hues, 473 F.3d 440, 442 (2d Cir. 2007) (quoting Neitzke v. Williams, 490 U.S. 319, 325 (1989)).  Malicious claims are filed with the intent to hurt or harm another.  Id. (citations omitted).  The failure to

---

[8] One of the cases which defendants offer as a strike dismissed pursuant to 28 U.S.C. § 1915 (d), a section which did not at that time authorize dismissals.  Defs. Memorandum of Law (Dkt. No. 91-15) at 5.  Defendants argue that this is clearly a typographical error, but without the underlying decision which articulates the reasons for which the claim was dismissed, construing the facts in the light most favorable to Guarneri prevents assuming what the actual intentions of the court were in dismissing that claim.

[9] The three-strikes provision was adopted as part of the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1995), which had as its principal purpose deterring frivolous prisoner litigation.  Nicholas v. Tucker, 114 F.3d 17, 19 (2d Cir. 1997).

state a claim applies a parallel definition from Fed. R. Civ. P. 12(b)(6), but "it does not follow that a complaint which falls afoul of the [12(b)(6) motion to dismiss] standard will invariably fall afoul of the [§ 1915(g) standard]." Neitzke, 490 U.S. at 326; see also Tafari, 473 F.3d at 442 (citations omitted).

 This "three-strikes" provision contains a narrow exception which permits suits, notwithstanding prior dismissals, when the prisoner is "under imminent danger of serious physical injury." 28 U.S.C. § 1915(g); see also Lewis v. Sullivan, 279 F.3d 526, 531 (7th Cir. 2002) (applying imminent danger exception "[w]hen a threat or prison condition is real and proximate, and when the potential consequence is 'serious physical injury.') In determining whether the imminent danger provision applies, the court must evaluate whether the claimed danger was still in existence when the complaint was filed and whether such danger was serious enough, in light of the liberal standards accorded to pro se plaintiffs, to require protection. Chavis v. Chappius, 618 F.3d 162, 169-70 (2d Cir. 2010) (citations omitted). Additionally, dismissal is not precluded by the fact that Guarneri has already been granted IFP status in this action. Dkt No. 7. When a court becomes aware of three prior strikes only after granting IFP status, it is appropriate to revoke that status and bar the complaint under § 1915(g). See McFadden v. Parpan, 16 F. Supp. 2d 246, 247 (E.D.N.Y. 1998).

 As previously stated, Guarneri has filed multiple lawsuits in the Second Circuit, and the Northern District. Two of the three cases noted above were dismissed for failure to state a claim and the third for being a frivolous action, both included within the categories of cases identified for accruing a strike. In Guarneri I, the court expressly dismissed Guarneri's claims because he had failed to state a claim. Dkt. No. 91-5 at 7, Entries 45-46. Even

17

though this is only documented through the docket sheet, the court's use of express

language dismissing Guarneri's claim for failing to state a claim suffices to satisfy the strike

provision.   See Andrews v. King, 398 F.3d 1113, 1120 (9th Cir. 2005) (holding that

"defendants must produce documentary evidence . . . to conclude that the plaintiff has filed

at least three prior actions that were dismissed [as strikes and that] . . . docket records may

be sufficient . . . [if they indicate] that a prior case was dismissed because it was frivolous,

malicious or failed to state a claim.") (internal quotation marks and citations omitted);

see also Harris v. City of New York, 607 F.3d 18, 23-24 (2d Cir. 2010) ("Nothing in the

PLRA or caselaw . . . suggests that courts have an affirmative obligation to examine actual

orders of dismissal," when docket sheets "accurately describe the grounds for dismissal.").

In Guarneri II, the court dismissed Guarneri's claims both because he initially failed to

state a claim and because he failed to comply with court orders to file an amended

complaint which corrected his conclusory and inadequate allegations.  The court ultimately

referred to the initial report-recommendation opinion, identifying Guarneri's failure to

establish defendants' personal involvement and articulate his claims with specificity and

particularity, to dismiss his complaint.  Both of those reasons suffice to support a dismissal

for failure to state a claim.

However, it is unclear whether this district would consider Guarneri III as a strike

because Guarneri's claims were dismissed for his failure to prosecute the claims.

Defendants argue that, pursuant to Bermudez v. Rossi et al., No. 07-CV-367, 2008 WL

619170 (N.D.N.Y. Mar. 3, 2008), claims dismissed for failure to prosecute and failure to

comply with court orders constitute a frivolous action.  Defs. Mem. of Law at 5-6; see also

Bermudez, 2008 WL 619170, at *3 (Dkt. No. 91-6 at 11-15) (citing cases which held that

18

failing to comply with court orders and failing to prosecute amounted to frivolous claims worthy of a strike). Additionally, dismissals for failure to prosecute pursuant to Rule 11 of the Federal Rules of Civil Procedure have been classified in this district as "akin to the filing of a frivolous claim." Gill v. Pidlypchak, No. 02-CV-1460 (FJS/RFT), 2006 WL 3751340, at *4, n.7 (N.D.N.Y. Dec. 19, 2006) (Dkt. No. 91-6 at 16-22). Conversely, in McFadden v. Herman, No. 09-CV-1415, 2010 WL 5572766 (N.D.N.Y. Oct. 4, 2010), Bermudez was examined for the same proposition, but it was found that such dismissals did not amount to a strike. Id., 2010 WL 5572766, at *1-2 (citations omitted) (attached to this decision).

When Guarneri III was filed, Guarneri had been engaged in litigation against various DOCCS employees for at least two years. In Guarneri III, Guarneri filed a complaint, four notices rejecting proposed amended complaints, an amended complaint, and multiple letter requests over the course of four years before the case was ultimately dismissed for a failure to prosecute. Dkt. no. 91-6. While conflict appears to exist in this district as to whether a dismissal for failure to prosecute, on its face, represents a frivolous action, the submitted docket sheet in addition to the amount of time elapsed and judicial resources expended during the course of this case lead to the conclusion that the dismissal was in response to a frivolous action. This is not a "temporarily infected [case] with remediable procedural or jurisdictional flaws" but one closer to Congress' intended policy behind the three-strike provision to prevent "the tide of egregiously meritless lawsuits . . . ." Tafari, 473 F.3d at 443 (citations omitted). Accordingly, Guarneri's failure to prosecute and comply with court orders to keep the court apprised of his current whereabouts support the conclusion that this dismissal also counts as a strike.

Guarneri's response papers to the present motion fail to allege that the imminent danger

19

exception would apply to the present case.  Guarneri Mem. of Law (Dkt. No. 93) at 9-10.  In fact, it appears that Guarneri accepts that the exception is inapplicable and that, at worst the consequences would "only . . . [require Guarneri] to pay the filing fee for this case [which] does not end the case or change the facts."  Id. at 10.  Therefore, the imminent danger exception is inapplicable to the present case.

Accordingly, defendants' motion to dismiss should be granted on this ground, Guarneri's present IFP status should be revoked, and he should be required to remit the appropriate filing fee.


## C. Access to Courts

As to the merits of Guarneri's claims, "[p]risoners . . .  have a constitutional right of access to the courts . . . ."  Bourden v. Loughren, 386 F.3d 88, 92 (2d Cir. 2004) (internal quotation marks omitted) (citing Bounds v. Smith, 430 U.S. 817, 821-22 (1977) (citations omitted) (holding that all prisoners have a well-established Constitutional right to "adequate, effective, and meaningful" access to courts).  This "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers . . . ."  Bounds, 430 U.S. at 828.  In order to state a claim for denial of access to the courts, a plaintiff must allege "that a defendant caused 'actual injury,' i.e., took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'"  Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (citing Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (quoting Lewis v. Casey, 518 U.S. 343, 351 (1996)).  The injury must have been the result of the deliberate and malicious behavior of a defendant.  Tajeddini v. Gluch, 942 F. Supp. 772, 780 (D. Conn. 1996).

In this case, Guarneri contends that his rights were infringed upon when his legal papers

were lost, he was denied paper[10], he did not have a competent law library assistant, and he was charged for expenses for photocopying his materials.  Some of these allegations are insufficient to state a claim.  Specifically, Guarneri's request to have more intelligent and capable law library assistants is meritless.  See Lewis v. Casey, 518 U.S. 343, 351 (1996) (explaining that there is no "abstract, freestanding right to a law library or legal assistance, [and that] an inmate cannot establish relevant . . . injury [requiring constitutional protection] simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense.").  While Guarneri may be frustrated by the caliber of assistance the prison provides, this is insufficient to reach the status of a constitutional violation.  Accordingly, because Guarneri has no legal entitlement to assistants with a certain level of education or experience, such relief should be denied.  Additionally, "an inmate has no constitutional right to free copies . . . ."  Collins v. Goord, 438 F. Supp. 2d 399, 416 (S.D.N.Y. 2006) (citations omitted).  Thus, Guarneri's claims that his rights were violated by having to pay for his photocopies is unsupported by federal law.

    As to Guarneri's other claims, he contends that these actions resulted in prejudice to his legal actions.  However, Guarneri fails to state which legal actions were prejudiced.  Conclusory generalizations are insufficient to establish an actual injury.  See Lewis, 518 U.S. at 351 (giving examples of actual injury including inability to assert or continue a

---

[10] "It is undisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents . . . ."  Bounds, 430 U.S. at 824.  Thus, at first blush, Guarneri states a cognizable claim.  However, his claim is conclusory and belied by the record.  Guarneri has actively participated in the current litigation, executing his handwritten complaint in June of 2008 when he was confined at Upstate.  Compl. at 52-53.  Additionally, defendants' provided the court with copies of a grievance and appeal which were also submitted, handwritten on a sheet of paper, while Guarneri was incarcerated at Upstate.  Dkt. No. 91-10 at 3, 6.  Such claims should be dismissed as meritless.

claim); Arce v. Walker, 58 F. Supp. 2d 39, 43 (W.D.N.Y. 1999) ("[A] claim that prison practices kept a prisoner from raising an argument or asserting a claim in his pleadings, in response to a dispositive motion, or at trial would likely suffice to show harm," but claims that the prison practice prevented the inmate from "ma[king] a more compelling or sophisticated argument would not."). Accordingly, without identification of the underlying action which was prejudiced, actual injury, and by extension a First Amendment violation, cannot be established. See Christopher v. Harbury, 536 U.S. 403, 415 (2002) ("[T]he underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation.").

Accordingly, defendants' motion should be granted on this ground.


### D. Eighth Amendment[11]

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This includes the provision of medical care. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. Wilson v. Seiter, 501 U.S. 294, 297 (1991); Hathaway, 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very

---

[11] Guarneri's claims that defendants did not properly provide him with names of other medical personnel who he wished to include as defendants is moot as, for the reasons articulated infra, no Eighth Amendment violation has been demonstrated. Moreover, it is noteworthy that Guarneri has proffered these same claims relating to his knee, back, shoulder, and mental health treatment, with regard to other defendants and facilities, and those claims were also denied. See Guarneri v. Hazzard, No. 06-CV-985, 2010 WL 1064330 (N.D.N.Y. Mar. 22, 2010); Guarneri v. Bates, No. 05-CV-444, 2008 WL 686809 (Mar. 10, 2008).

purpose of causing harm." Hathaway, 37 F.3d at 66.  The test for a § 1983 claim is twofold.

First, the prisoner must show that there was a sufficiently serious medical need.  Chance v.

Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).  Second, the prisoner must show that the

prison official demonstrated deliberate indifference by having knowledge of the risk and

failing to take measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a

substantial risk to inmate health or safety may be found free from liability if they responded

reasonably to the risk, even if the harm ultimately was not averted."  Farmer v. Brennan,

511 U.S. 825, 844 (1994).

"'Because society does not expect that prisoners will have unqualified access to

healthcare', a prisoner must first make [a] threshold showing of serious illness or injury" to

state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting

Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a

serious medical condition is determined by factors such as "(1) whether a reasonable doctor

or patient would perceive the medical need in question as 'important and worthy of

comment or treatment,' (2) whether the medical condition significantly affects daily

activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d

158, 162-63 (2d Cir. 2003)(citing Chance, 143 F.3d at 702).  The severity of the denial of

care should also be judged within the context of the surrounding facts and circumstances of

the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and

disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, prison

officials must be "intentionally denying or delaying access to medical care or intentionally

interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104,

23

(1976).

> Thus, disagreements over medications, diagnostic techniques (e.g.,
> the need for x-rays), forms of treatment, or the need for specialists
> or the timing of their intervention, are not adequate grounds for a
> Section 1983 claim.  These issues implicate medical judgments
> and, at worst, negligence, amounting to medical malpractice, but
> not the Eighth Amendment.

Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y.

2001) (citing Estelle, 429 U.S. at 107); see also Chance, 143 F.3d at 703 (holding that

"[m]ere disagreement over proper treatment does not create a constitutional claim," as long

as the treatment was adequate).  Furthermore, allegations of negligence or malpractice do

not constitute deliberate indifference unless the malpractice involved culpable recklessness.

Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

     Guarneri's overarching contention is that he received no treatment because the medical

staff refused to provide care for any inmate incarcerated at Upstate for less than a year, or

that the care rendered was too abrupt to be effective, is belied by the medical record.  The

record demonstrates that Guarneri received a wide array of treatment including an intake

assessment, therapy, medication, and follow-up care as referenced infra.  Moreover, to the

extent that Guarneri's complaints can be construed as a general Eighth Amendment claim

that his time in Upstate's Special Housing was per se cruel and unusual punishment, such

claims are meritless.  See Coleman v. Beale, 636 F. Supp. 2d 207, 212 (W.D.N.Y. 2009)

(finding no Eighth Amendment cause of action where inmate "has not alleged or presented

any facts showing that his conditions of confinement in SHU were particularly severe, or

that they jeopardized his health or safety . . . .") (internal quotation marks and citations

omitted).  Accordingly, defendants' motion for summary judgment should be granted on this

ground.

## 1. Knee

Guarneri may have offered evidence sufficient to conclude that the knee injury he sustained was serious. Generally, knee injuries have been "insufficient to trigger Eighth Amendment protection and support a deliberate indifference claim." Johnson v. Wright, 477 F. Supp. 2d 572, 575 (W.D.N.Y. 2007) (holding that a prisoner's torn meniscus suffered as a result of a basketball injury was not a serious medical need) (citations omitted). However, construing the facts in the light most favorable to Guarneri, his allegations of pain, recommendations for therapy and surgery, and requirement of an assistive device to help ambulate long distances suffice to establish a serious medical need.

However, it is clear that defendants were not deliberately indifferent to his medical care. Medical records show that radiological exams were done to assess the severity of Guarneri's injuries and that he was offered a range of conservative treatment methods. Guarneri was prescribed physical therapy but chose not to engage in it prior to his incarceration at Upstate. Any ill effects attributable to the lack of consistent therapy cannot be attributed to defendants as Guarneri made the decisions not to participate in said therapy. Moreover, any consequences for not pursuing a surgical intervention are also attributable to Guarneri who indicated that he wished to wait for his release from incarceration to pursue such treatment.

To the extent that Guarneri contends that defendants were deliberately indifferent for failing to provide him with his knee brace at all times in Upstate, such contentions are also meritless. The record shows that, upon arrival at Upstate, Guarneri had regularly been

ambulating without his knee brace without any difficulty.  Thus, medical records support the decision not to provide him with a brace.  Furthermore, Guarneri was not completely denied use of the brace.  The fact that Guarneri felt that he required the brace at all times and not just for distances greater than fifty feet amounts to a disagreement in the progression of his treatment, which is insufficient to establish an Eighth Amendment violation.  Sonds, 151 F. Supp. 2d at 312.

Additionally, Guarneri's claims that he should have received a different type or doseage of pain medication to alleviate the resulting symptoms from his knee injury are also insufficient to raise a question of fact.  The record shows that defendants did attempt to treat Guarneri's subjective complaints of pain with a variety of medication.  Defendants regularly offered Guarneri non-narcotic pain medication and he refused it because he felt that he should be prescribed different medication.  Guarneri's complaints about the type of medication given to him for pain again amounts to a disagreement over treatment, which is insufficient to allege a constitutional violation.  Sonds, 151 F. Supp. 2d at 312.  Defendants also prescribed Guarneri with pain medication.  Guarneri's subsequent complaints and resulting claims that the doseage of such medication was not strong enough are also insufficient to state a claim.  The record shows that defendants monitored Guarneri's health and pain levels and, for his own safety, refused to increase the doseage of medication because they were concerned about its addictive properties and because Guarneri had not yet given the medication enough time to produce its therapeutic effect.  All of these disagreements over the type and amount of medication to prescribe for Guarneri's knee pain are insufficient to establish a constitutional claim.  Sonds, 151 F. Supp. 2d at 312.

Accordingly, defendants' motion should be granted on this ground.

## 2. Shoulder

As to the first prong of the analysis, Guarneri may have offered sufficient evidence to prove that his shoulder injury constituted a serious medical need.  Other cases suggest that allegations of "severe pain . . . [and] reduced mobility . . ."  in the shoulder are sufficient to raise a material issue of fact as to a serious medical need.  Sereika v. Patel, 411 F. Supp. 2d 397, 406 (S.D.N.Y. 2006).  Thus, when applying the aforementioned three-part test, it appears that Guarneri has demonstrated a serious medical need.

However, for substantially the same reasons as discussed supra, Guarneri has failed to proffer facts sufficient to show a material dispute about the quality of medical care that he received.  The medical records show that Guarneri was evaluated, radiological films were taken, conservative treatment methods for his joint problems and pain were offered, he was given pain medication, and he was continually attended to.  Any disagreements Guarneri has with the method or type of treatment provided to him is insufficient to state a claim as all the intervention he received was adequate.

Accordingly, defendants' motion should be granted on this ground as well.

## 3. Mental Health

Guarneri also alleges that he suffered from and received inadequate medical treatment for post-traumatic stress disorder ("PTSD"), bipolar disorder, and depression.   "Treatment of mental disorders of mentally disturbed inmates is . . . a serious medical need" as contemplated by Estelle.  Guglielmoni v. Alexander, 583 F. Supp. 821, 826 (D. Conn. 1984).  Thus, considering all of Guarneri's various complaints concerning his mental health, it is clear that he has alleged facts sufficient to provide relief as to whether he suffered a

serious medical need as a result of his mental illnesses.

However, Guarneri's claim still fails because he has failed to establish that any of the represented defendants were personally involved in his mental health treatment. "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  The record is clear that any and all mental health treatment, including prescription and provision of medication, was provided by the OMH and not DOCCS.[12]  Accordingly, defendants' motion should be granted on this ground.

However, even assuming the appropriate defendant had been served, Guarneri's claims still fail to establish a constitutional violation.  The gravamen of Guarneri's complaint is that he required certain medications and that the facility prescribed a different medication, which he claimed was ineffective.  This again amounts to a difference in opinion over treatment methods and modalities, a contention which is insufficient to state an Eighth Amendment claim.  Sonds, 151 F. Supp. 2d at 312.  Furthermore, the record demonstrates that Guarneri voluntarily chose to refuse continuing his prescribed medication.  Therefore, any consequences occurring as a result of Guarneri's decision to cease taking the prescribed medication after its discontinuation at Upstate cannot be attributed to deliberate indifference on the part of any defendant.

Accordingly, defendants' motion for summary judgment should be granted as to this claim.

---

[12] The only defendant who was involved in the provision of mental health, defendant Demarse, has not been served or otherwise appeared.  Dkt. No. 26.

### 4. Disclosure of Medical Records

Liberally construing Guarneri's complaint, he contends that his medical records were not handled by defendants with a proper regard for their confidential nature, presumably because defendants used his records without his prior consent or written authorization.

Claims surrounding disclosure of confidential medical information are analyzed under both the Eighth and Fourteenth Amendments. See generally Rodriguez v. Ames, 287 F. Supp. 2d 213, 218-21 (S.D.N.Y. 2003). However, the expectation that a plaintiff has in maintaining the confidentiality of his or her medical records is neither concrete nor absolute. See Doe v. Marsh, 918 F. Supp. 580, 585 (N.D.N.Y. 1996) ("[I]t also was clear that the privacy right, at least as it applied to medical information, was not absolute."); Jarvis v. Wellman, 52 F.3d 125, 126 (6th Cir. 1995) ("[T]he court approved the release of medical records . . . based upon the legitimate nature of the requests for information. The district court inferred from this approach that a non-legitimate release of confidential medical information would violate a constitutional right . . . .") (internal quotation marks and citations omitted). Accordingly, when an inmate affirmatively places his medical condition at issue in litigation, he may waive any right to privacy in that information. See Doe, 918 F. Supp. at 585 ("A plaintiff may waive the privilege when his medical condition is at issue in a lawsuit.").

Moreover, such privacy rights can be outweighed by a strong government interest, such as the need for investigation into policies and procedures and marshaling a defense to constitutional claims. Doe, 918 F. Supp. at 585 ("The right to privacy in one's medical history is a conditional right that may be overcome by the government's interest in having or using the information.") (citations omitted). Such governmental uses must "advance a

29

substantial state interest" while using the most "narrowly tailored [amount of confidential information] to meet the legitimate interest." Id. (citations omitted); see also Rodriguez, 287 F. Supp. 2d at 219-20 (upholding Fourteenth Amendment protection where the prisoner "has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence," or where the information "spread through 'humor or gossip.'") (quotations omitted); Webb v. Goldstein, 117 F. Supp. 2d 289, 298-99 (E.D.N.Y. 2000) (dismissing a Fourteenth Amendment claim because the prisoner "has not alleged that his prison records contained the sort of sensitive medical information at issue in . . . Powell.").

In this case, it is clear that Guarneri's claims directly relate to his medical conditions. As such, he affirmatively placed the conditions at issue and waived his right to object to any subsequent release of his records. Additionally, to the extent a privacy interest may still exist, the nature of the lawsuit, which alleges that the defendants failed to provide necessary medical treatment for a person in its custody, represents the type of strong and legitimate penological interest contemplated by the disclosure exceptions. Moreover, the medical information was released only to necessary parties, the attorneys defending the respective individual defendants. The information was not widely disseminated, and as such, no unnecessary third parties became privy to the material.

Accordingly, the motion of the defendants as to this claim should be granted.


### 5. Provision of Medical Care as a Parolee

Guarneri claims that for the six months he was housed in the Parole Stabilization Program, he was denied mental health treatment by the parole defendants. Guarneri Dep.

at 107-108.  The Northern District has found that, although the state does not generally have an affirmative duty to provide medical services to anyone, there is an obligation to continue to provide medical services to individuals recently released from incarceration. Lugo v. Senkowski, 114 F. Supp. 2d 111, 114 (N.D.N.Y. 2000).  This includes parolees. That duty extends until the parolee is able to secure medication on his own, which may realistically be a period of days or weeks after release.  Id.  Until that time, the state is required to provide the parolee with a supply of medication sufficient to sustain him until he can obtain his own medical treatment.  Id. at 115.

Medical records do not indicate that Guarneri was receiving any mental health medication or treatment at the time prior to  the three week period he was living at the Parole Stabilization Program.  Therefore, there is nothing in the record to demonstrate that he was entitled to a supply of medication upon his release.  Moreover, except for Guarneri's conclusory allegations, there is nothing in the record to indicate that parole defendants did not provide access to mental health services to attempt to initiate treatment for Guarneri.

Contrary to Guarneri's contentions, the parole logs indicate that the personnel at the program were neither deliberately indifferent nor unresponsive to Guarneri's mental health needs.  Staff initiated a conference call with Albany County Mental Health to arrange for treatment almost immediately after Guarneri reported to the program.  The fact that Guarneri preferred, and was a prior patient of, Schoharie County Mental Health was unknown to the parole defendants at the program.  Immediately after Guarneri's request to be seen by Schoharie for psychiatric services, a telephone call was made to arrange for an appointment.  Guarneri had left the program prior to Schoharie having to change to schedule the appointment with him.  This was not the fault of defendants.  Their actions in

immediately contacting a facility for an appointment upon Guarneri's request, in addition to their preliminary efforts to schedule Guarneri with Albany County, refute any contentions of indifference or delay.

Moreover, parole defendants maintained constant contact with Guarneri after he was relocated to his mother's house.  Guarneri was scheduled with Schoharie County Mental Health at the beginning of August and parole made arrangements for transportation to the appointment since Guarneri had problems acquiring his own.  These are not actions of defendants who are deliberately indifferent.  Furthermore, parole defendants were constantly inquiring as to Guarneri's status with his temperament and responses to temptations for addictive substances.  This constant dialogue presented multiple opportunities for Guarneri to express additional requests for continued, expedited or additional mental health services.  No requests were forthcoming.  Parole defendants cannot be tasked with having premonitions about Guarneri's mental health needs.  They responded quickly and adequately to the concerns he raised.  Guarneri had the opportunity and responsibility to ask for any additional help.  His failure to do so cannot be attributed to defendants as an act of deliberate indifference.

Accordingly, defendants' motion on this ground should be granted.


### E. Confiscation/Destruction of Property

Guarneri claims that defendants confiscated, destroyed or lost his legal property.  For the reasons stated supra, such claims have failed to establish a First Amendment violation.  Additionally, such claims fail to establish a Fourteenth Amendment violation.

An inmate has a right not to be deprived of property without due process.  However,

federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue.  Hudson v. Palmer, 468 U.S. 517, 533 (1984).  "An Article 78[13] proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims."  Locurto v. Safir, 264 F.3d 154, 174 (2d Cir. 2001) (citations omitted); see also N.Y. C.P.L.R. §§ 7803, 7804; Campo v. New York City Employees' Ret. Sys., 843 F.2d 96, 101 (2d Cir. 1988) ("Article 78 . . . provides a summary proceeding which can be used to review administrative decisions.").  State law also provides that "[a]ny claim for damages arising out of any act done . . . within the scope of . . . employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state."  N.Y. Corr. Law § 24(2).

In this case, Guarneri contends that there was an unconstitutional deprivation when his legal property was allegedly confiscated.  Such claims fail as a matter of law for several reasons.  First, the Article 78 procedure exists and affords an adequate state court remedy.  Second, because Guarneri is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24.  Thus, the correct venue to litigate these claims is in state court.

Accordingly, defendants' motion should be granted as to this claim.

---

[13]N.Y. C.P.L.R. art. 78 establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

**F. Grievance Proceedings**

An action commenced pursuant to§ 1983 requires proof of the "deprivation of any right[],

privilege[], or immunit[y] secured by the Constitution" or laws of the federal government.  42

U.S.C. § 1983.  Thus, no action lies under § 1983 unless a plaintiff has asserted the

violation of a federal right.  See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers

Ass'n, 453 U.S. 1, 19 (1981).

"[I]nmate grievance programs[14] created by state law are not required by the Constitution

and consequently allegations that prison officials violated those procedures does not give

rise to a cognizable § 1983 claim."  Shell v. Brzezniak, 365 F. Supp. 2d 362, 370 (W.D.N.Y.

2005) (citations omitted); see also Dolberry v. Levine, 567 F. Supp. 2d 413, 416 (W.D.N.Y.

2008) ("The law is clear that plaintiff has no constitutional right to have his grievances

processed at all, or if processed, to have the procedure done properly.  A violation of the

inmate grievance procedures does not give rise to a claim under section 1983.") (internal

quotation marks and citations omitted).  However, "[i]f prison officials ignore a grievance

that raises constitutional claims, an inmate can directly petition the government for redress

of that claim." Shell, 365 F. Supp. 2d at 370 (citations omitted).

In this case, Guarneri cannot establish that he had a liberty interest which required

constitutional protection.  To the extent that Guarneri has proffered complaints about the

grievance process as a whole, stating that grievances were summarily denied, that he did

---

[14]The DOCCS IGP [Inmate Grievance Program] is a three-step process that
requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution
Committee]; (2) appeal to the superintendent within four working days of receiving the
IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee]
... within four working days of receipt of the superintendent's written response." Abney v.
McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

not receive the correct paperwork that he required, or that claims were not properly

addressed and mailed to the IGRC, such claims are not cognizable in this court.

Additionally, to the extent Guarneri's grievances dealt with the underlying constitutional

violations discussed in this report-recommendation, specifically alleged violations of his

First, Eighth, and Fourteenth Amendment rights, for the reasons proffered herein, such

claims are meritless.  Defendants' motion on this ground should be granted.


### G. Conspiracy

In his complaint, Guarneri asserts a cause of action pursuant to § 1985 based upon

defendants' attempts to obstruct justice, specifically through the grievance program.

"Section 1985 prohibits conspiracies to interfere with civil rights."  Davila v. Secure

Pharmacy Plus, 329 F. Supp. 2d 311, 316 (D. Conn. 2004). To state a claim for relief under

§ 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly,
> any person or class of persons of the equal protection of the laws, or of equal
> privileges and immunities under the laws; and (3) an act in furtherance of the
> conspiracy; (4) whereby a person is either injured in his person or property or
> deprived of any right of a citizen of the United States.

United Bd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828-29

(1983).  Additionally, a plaintiff "must demonstrate that the defendant . . . acted with class-

based invidiously discriminatory animus."   Webster v. Fischer, 694 F. Supp. 2d 163, 196

(N.D.N.Y. 2010) (citations omitted).

Here, Guarneri does not assert any facts giving rise to a conspiracy.  First, Guarneri

vaguely asserts conclusory statements relating to an alleged conspiracy among defendants.

This is insufficient.  See generally Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999)

(granting summary judgment for a § 1985(3) claim where the "assertions were conclusory and vague, and did not establish the existence of an agreement among defendants to deprive [plaintiff] of his constitutional rights.").  Second, there has been proffered no evidence relating to agreements, or even communications, between the  defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive Guarneri of his civil rights.  See Webb v. Goord, 340 F.3d 105, 110-11 (2d Cir. 2003) ("In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.") (internal quotation marks and citations omitted); see also Romer v. Morgenthau, 119 F. Supp. 2d 346, 364 (S.D.N.Y. 2000) (explaining that a plaintiff "cannot satisfy the conspiracy prong [if] his claims are too general and conclusory to sufficiently plead the meeting of the minds requirement.") (citations omitted).  Murray also fails to allege or establish discriminatory animus.

Additionally, if any defendant "ha[d] knowledge that any of the wrongs . . . mentioned in section 1985 . . . [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do . . ., [he] shall be liable to the party injured."  42 U.S.C. § 1986.  However, "[a] claim under section 1986 . . . lies only if there is a viable conspiracy claim under section 1985."  Gagliardi v. Vill. of Pawling, 18 F.3d 188, 194 (2d Cir.1994).  No such viable claim has been shown here.

Accordingly, defendants' motion as to this claim should be granted.

## H. Parole[15]

### 1. Alleged Deficiencies in Preliminary Hearing

A final parole revocation proceeding is an administrative proceeding held solely to enable parol authorities to determine whether the parolee violated the terms of parole. People ex rel. Maiello v. New York State Bd. of Parole, 65 N.Y.2d 145, 147 (1985). Although a parolee facing revocation of release is not entitled to the "full panoply of rights" due a defendant in a criminal prosecution, the Supreme Court has held that the revocation of parole implicates a liberty interest protected by the Due Process Clause of the Fourteenth Amendment.  Morrisey v. Brewer, 408 U.S. 471, 482 (1972).  Upholding the Morrisey decision, a year later the Supreme Court further defined the process required during a preliminary parole revocation hearing.  Gagnon v. Scarpelli, 411 U.S. 778, 786 (1973).  "At the . . . hearing, a probationer or parolee is entitled to notice of the alleged violations of probation or parole, an opportunity to appear and to present evidence in his own behalf, a conditional right to confront adverse witnesses, an independent decisionmaker, and a written report of the hearing."  Id. (citing Morrisey, 408 U.S. at 487). Furthermore, at the final hearing, individuals are given a more detailed hearing with the minimum requirements including:

'(a) written notice of the claimed violations of (probation or) parole;

---

[15] Defendants also contend that Guarneri's parole revocation claims were barred by the Rooker-Feldman doctrine.  Under that doctrine, federal courts lack subject matter jurisdiction over claims that effectively challenge state court judgments.  See District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 486-87 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16 (1923).  In light of the recommendations herein as to defendant Skinner, the Rooker-Feldman doctrine need not be addressed.  The preclusive effects of Heck v. Humphrey, 512 U.S. 477 (1994), and its favorable termination rule also will not be addressed since defendants did not raise that argument in their papers.

> (b) disclosure to the (probationer or) parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking (probation or) parole.

Id. (citing Morrisey, 408 U.S. at 489)

Here, Guarneri alleges that a variety of his constitutional rights were violated during the course of his preliminary hearing. Compl. ¶¶ 96-109. Guarneri contends that his parole was revoked based on false statements from Skinner, that he was denied his right to confront witnesses and have counsel, and that he made statements in contravention of his rights against self-incrimination. Id. However, the record demonstrates that Guarneri received what the process to which he was entitled.

Guarneri was served with a violation of probation report and stated that he received that report prior to his preliminary hearing. Dkt. No. 91-13 at 73. Thus, Guarneri was provided with notice of the alleged parole violations. Additionally, Guarneri was provided with the opportunity to cross examine the witnesses during the preliminary hearing, as well as call his own witnesses during the course of the hearing. Id. at 86-90, 92, 100-09. Guarneri was also permitted to present a closing statement. Id. at 93-94, 109-11. Guarneri also engaged in a lengthy conversation with the hearing officer about the state of his mental health and his ability to comprehend the preliminary hearing proceedings and confidently represent himself.[16] Id. at 76-78. Therefore, the record conclusively refutes any arguments that

---

[16] The Supreme Court has held that the right to counsel at parole revocation hearings is limited and should be determined based upon the circumstances of each case. See Gagnon, 411 U.S. at 790.

38

Guarneri's mental health problems interfered with his preliminary hearing.  Lastly, Guarneri was provided with an explanation on the record of the reasons for finding probable cause, as well as a written statement.  Id. at 111, 151.  While Guarneri contends that defendant Skinner committed perjury, the hearing officer's decision finding probable cause resulted from the testimony of Skinner as well as the witness testimony and the inconsistencies in Guarneri's own testimony.  Therefore, there were multiple sources upon which to find probable cause.  Guarneri's claims regarding his need for counsel during the preliminary hearing are rejected as he was not guaranteed counsel at that stage and his own testimony indicated that he did not require counsel.  Counsel was provided for Guarneri during his final revocation proceedings, where the ultimate decision to revoke his parole was made.  Moreover, the right to call witnesses was not an element of due process afforded during the preliminary hearing.  Thus, Guarneri was provided with all portions of due process identified by the Supreme Court as necessary during a preliminary hearing.

Guarneri asserted no issues regarding the observance of his constitutional rights during his final revocation hearing.  Even liberally construing his complaint to include such allegations, these contentions would be negated by the record and Guarneri's knowing and voluntary guilty plea.  See generally Tollett v. Henderson, 411 U.S. 258, 267 (1973) (concluding that "a guilty plea represents a break in the chain of events which has preceded it . . . .," therefore, when a guilty plea is rendered, the defendant, "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.  He may only attack the voluntary and intelligent character of the guilty plea . . . ."); United States v. Coffin, 76 F.3d 494, 498 (2d Cir. 1996) (same).  Guarneri has not made any contentions against the knowing and voluntariness of his plea.

39

Moreover, the dialogue between the judge, Guarneri, and his counsel would refute any claims that Guarneri's plea was made under misinformation, duress, or coercion. Specifically, the judge discussed, on the record, with Guarneri that he was on medication for mental health issues, had taken that medication, felt well that day, and understood the proceedings  prior to accepting his plea of guilty.  Dkt. No. 91-13 at 133-34.  Accordingly, any contentions that Guarneri may have proffered that his mental illness interfered with his parole revocation proceedings is belied by the record.

Therefore, defendants' motion should be granted on this ground.


## 2. Absolute Immunity

Guarneri has named parole officers Skinner, Robin, and Lusseve and parole supervisor Lowary as defendants in this action in connection with their actions regarding his parole revocation.  However, "[p]arole officers . . . receive absolute immunity for their actions in initiating parole revocation proceedings and in presenting the case for revocation to hearing officers, because such acts are prosecutorial in nature."  Scotto v. Almenas, 143 F.3d 105, 112 (2d Cir. 1998) (citations omitted).  The same is true for parole board officials who "serve a quasi-adjudicative function in deciding whether to grant, deny, or revoke parole."  Montero v. Travis, 171 F.3d 757, 761 (2d Cir. 1999).  Accordingly, with regard to the parole defendants and their actions in instituting, pursuing, and ordering Guarneri's parole revocation, such actions are protected and these defendants are absolutely immune from suit.

Therefore, defendants' motion on this ground should be granted.

### 3. Conditions of Parole

To the extent that Guarneri contends that his conditions of parole "banishing" him from his home were unconstitutional, such claims are meritless.  "A parolee has no constitutionally protected interest in being free of a special condition of parole."  Boddie v. Chung, 2011 WL 1697965, at *1 (E.D.N.Y. May 4, 2011) (attached to decision) (citations omitted); see also  N.Y. Comp. Codes. R & Regs. tit. 9, § 8003.3. ("A special condition may be imposed upon a [parolee] either prior or subsequent to release," memorialized by "a written copy of each special condition imposed.").  Moreover, review of parole conditions are generally reserved to state courts.  Boddie, 2011 WL 1697965, at *2 (citations omitted). Lastly, "parole conditions are not subject to judicial review in the absence of a showing that the board or its agents acted in an arbitrary and capricious manner."  Id.  The conditions precluding Guarneri from initially returning to his home to live with his mother, who had an order of protection against Guarneri, was logical and reasonable and thus the condition was neither arbitrary nor capricious.  Guarneri's contentions that his eventual return to the home after he was dismissed from Parole Stabilization illustrate the fact that he the condition was illusory are also meritless.  The fact that parole authorities approved Guarneri's mother's home as a principle residence after it had been determined that the Division of Parole could not provide Guarneri with suitable alternative housing was preferable to the alternatives of leaving Guarneri homeless or reincarcerating him.  Moreover, the parole defendants acquired the mother's permission for him to live at the house while still maintaining the protective conditions of the order of protection.  Therefore, even though the housing requirement was eventually modified, the initial special conditions were still conserved and continued to be based on sound judgment.

41

Accordingly, defendants' motion should be granted on this ground.


### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

　　1. Defendants' motion for summary judgment (Dkt. No. 91) be **GRANTED** and that judgment be entered for all defendants on all claims; and

　　2. The complaint be **DISMISSED** without prejudice as to defendants Sergeant John Doe, Nurse Administrator Jane Doe, Medical Director John Doe and Soucia, Demarse, and Lusseve.

　　Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: September 2, 2011
　　　 Albany, New York

　　　　　　　　　　　　　　　　_David R. Homer_____

　　　　　　　　　　　　　　　United States Magistrate Judge